UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Paul C. Stepnes,

   Plaintiff,

v.             Civil No. 04-68 (JNE/JSM)
              ORDER

Robert J. Tennessen, Christine Tennessen,
City of Minneapolis, Minneapolis Police
Department, Officer Mark Wisocki, Officer
Paul Hatle, Officer Robert Illetschko,
Officer Adam Chard, in their individual
and official capacities, and John Does 1-4,

    Defendants.

---

Jill Clark, Esq., Jill Clark, P.A., appeared for Plaintiff Paul C. Stepnes.

Andrew T. Shern, Esq., Murnane Brandt, P.A., appeared for Defendants Robert J. Tennessen and
Christine Tennessen.

James A. Moore, Esq., Minneapolis City Attorney's Office, appeared for Defendants City of
Minneapolis, Minneapolis Police Department, Officer Mark Wisocki, Officer Paul Hatle, Officer
Robert Illetschko, and Officer Adam Chard.

---

   Paul Stepnes brought this action against Robert and Christine Tennessen; the City of

Minneapolis (City); the Minneapolis Police Department; John Does 1-4; and City of Minneapolis

Police Officers Mark Wisocki, Paul Hatle, Robert Illetschko, and Adam Chard (collectively,

Officer Defendants).  Stepnes alleges claims under 42 U.S.C. § 1983 (2000) and claims for

malicious prosecution and defamation.[1]  The case is before the Court on the City, the

Minneapolis Police Department, and the Officer Defendants' (collectively, City Defendants)

---

[1]  In addition, Stepnes originally alleged a claim for intentional infliction of emotional
distress against the Tennessens and claims for violations of the Minnesota Constitution against
all defendants.  Because Stepnes has abandoned those claims, the Court dismisses them.

1

motion for summary judgment and the Tennessens' motion for summary judgment.  For the reasons set forth below, the Court grants the motions.

## I.     BACKGROUND

This case arises out of a dispute between neighbors.  In 1999, Stepnes purchased a home in the Kenwood neighborhood of Minneapolis.  His home, which he restored while living there until September 2003, was next door to the Tennessens' home.  Their respective properties are separated by a fence and a retaining wall.[2]  In or about April 2001, latent tensions between the Tennessens and Stepnes came to the surface and their relationship began to deteriorate.

On April 27, 2001, Stepnes grew tired of seeing a metal strip lying across his back steps.  Believing the metal strip belonged to the Tennessens, he placed it in their recycling bin.  The Tennessens' adult son, Michael—who is mentally impaired—noticed Stepnes' movement of the metal strip and became upset.  Michael and Stepnes exchanged words.  Stepnes asked that the Tennessens keep their garbage out of his yard.  Michael retorted, "My trash wasn't in your motherfucking yard," to which Stepnes responded "I don't need to take that kind of language from you."  Shortly thereafter, Michael pulled a knife out of a sheath and took several steps toward Stepnes.  At the time, Michael and Stepnes remained on opposite sides of the fence.

Stepnes called 911 to report Michael's conduct.  The police responded, and Sergeant Richard Zimmerman was assigned to investigate the complaint.  During the course of the investigation, Sergeant Zimmerman learned that Michael had been suspended at work for pulling a knife on a co-worker and obtained the knife Michael allegedly used.[3]  As part of his regular

---

[2]     Construing the record in the light most favorable to Stepnes, as the nonmoving party, the Court assumes that Stepnes' property runs beyond part of the fence.

[3]     Stepnes' memorandum in opposition to Defendants' motions for summary judgment suggests that Sergeant Zimmerman "found a tool in Michael's locker at work that fit the

practice in similar circumstances, he advised Stepnes to obtain a restraining order against Michael, which Stepnes did on May 17, 2001. Stepnes also pursued criminal prosecution of Michael for his conduct on that date. Both the Hennepin County Attorney's Office and the City Attorney's Office declined to press charges.

On June 5, 2001, Robert Tennessen filed a petition for harassment restraining order against Stepnes. He sought the restraining order, in part, because Stepnes allegedly assaulted him on June 2, 2001, in an alley near their homes. Robert sought an order against Stepnes on behalf of each of his family members. Hennepin County District Court Judge Philip Bush granted the Tennessens a temporary restraining order and set the matter for an initial appearance on June 18, 2001. On June 18, Robert and Stepnes appeared before Hennepin County Harassment Referee Mary Lawson. Referee Lawson ordered that the parties have no contact with each other until the next appearance on July 17, 2001. On July 16, 2001, the Tennessens filed an additional petition for temporary restraining order against Stepnes on behalf of Michael. The first appearance in that case was set for July 30, 2001. In light of the new petition for restraining order, the court rescheduled the July 17 and July 30 hearings for September 27, 2001, for a consolidated evidentiary hearing.

On August 9, 2001, Michael was mowing the lawn and mowed onto Stepnes' property. Stepnes asked Michael to leave his property. Michael refused and made an obscene gesture. Stepnes called the police to report this as a violation of the no-contact order. Minneapolis police

---

description given by Stepnes." In support of the statement, the memorandum cites "Exh. 11, Supp. 3 and Inventory report." Exhibit 11 is a one-page report of the April 27 incident that relays nothing about a search of a locker or the finding of a tool. Neither "Supp. 3" nor the "inventory report" is attached to Stepnes' submissions. In fact, it is clear from the evidence in the record that Sergeant Zimmerman did not find the tool in Michael's locker, but rather obtained the tool from Michael's employer, to whom Michael had already given the tool. Although resolution of this case does not hinge on this fact, the Court notes that this is one of several instances where factual assertions in Stepnes' memorandum could not be verified in the record.

responded, arrested Michael, and took him to jail.  Robert was out of town but learned from a neighbor that officers had been to his home.  He called his attorney to find out what was happening.  The attorney, Marc Kurzman, learned that Michael had been arrested.  Kurzman contacted Hennepin County District Court Judge Franklin Knoll at home to request that Judge Knoll order Michael released from jail into Kurzman's custody.  Satisfied that Michael was not dangerous, Judge Knoll called the jail and ordered Michael released.  Michael was not charged or prosecuted for the events of August 9.

On September 8, 2001, Stepnes' dog ran onto the Tennessens' property as Christine Tennessen was returning to her house with her dog.  What happened next is disputed.  Construing the record in the light most favorable to Stepnes, the Court assumes that Christine kicked Stepnes' dog and yelled at Stepnes to retrieve the dog.  When he went to fetch his dog, Stepnes brushed against Christine.  At that point, Christine fell backward, leaving dirt and grass stains on the back of her shirt.  Both parties called 911, Christine to report that Stepnes had violated the restraining order by coming onto her property and pushing her down, and Stepnes to report that Christine had kicked his dog.

Officers Wisocki and Hatle responded to the calls.  They went first to the Tennessens' home.  Based on Christine's account of what happened, together with her emotional state and the dirt and grass stains on her back, the officers determined that she had likely been assaulted by Stepnes.  The officers then went to Stepnes' home, placed him under arrest, handcuffed him, and put him in a squad car.[4]  According to Stepnes, when he looked back at Christine as the squad

---

[4]     Stepnes asserts in his memorandum that the officers admitted that they were intent on arresting Stepnes before they arrived at his house.  In support of the contention, he cites to "Tr. of criminal trial, Exh. 43."  In Stepnes' submissions, Exhibit 43 is "Intentionally left blank."  The Court has reviewed Stepnes' many submissions in great detail, but has been unable to find the admission upon which he relies.

car was driving away, she stopped crying and began laughing and pointing at him.  Stepnes was

taken to the Hennepin County Adult Detention Center, booked, provided a phone call, and given

a date for a court hearing.

On or about the next day, Robert went to the Minneapolis City Attorney's Office and

spoke with the Minneapolis City Attorney, Jay Heffern.  Heffern informed Robert that the matter

appeared to be criminal in nature and that he was not a criminal lawyer.  He told Robert that he

should speak with Assistant Minneapolis City Attorney John Manning.

Two days later, on September 11, 2001, Stepnes filed a petition in Hennepin County

District Court for a restraining order against Robert and Christine Tennessen.  After Judge

Warren Sagstuen recused himself, then-Chief Judge Kevin Burke ruled on Stepnes' petition.

Judge Burke denied the motion for an ex parte temporary restraining order but consolidated the

petition with the others for an evidentiary hearing.

On September 13, 2001, Stepnes was in the process of making a videotape of his property

line when Robert and Christine Tennessen returned home separately.[5]  Stepnes alleges that

Christine yelled at him to leave the property as he videotaped her movements into the house.[6]  In

---

[5]     Stepnes alleges that he was making the tape to use at an evidentiary hearing scheduled for
the next day regarding the property boundary dispute between him and the Tennessens.

[6]     The Court's multiple viewings of the videotape reveal no such interaction.  The tape does
show Robert returning from work and entering his house, and shows Christine retuning home
from a bike ride.  Christine does not appear to be confronting or communicating at all with
Stepnes.  The audio component of the tape is functional, and indeed the length—approximately
1.5 hours—of the tape is marked by spoken commentary by Stepnes, including the following
statements while the camera was trained on Michael mowing grass:  "He is in my fucking yard.
Get out of my fucking yard."  Ultimately, the discrepancy between Stepnes' factual assertions
and the scene as depicted in the video do not affect the disposition of the motions before the
Court.  The Court notes, however, that it was frustrated by being subjected—without warning—
to watching and listening to an hour and a half of largely irrelevant tape.  A good portion of the
tape showed Stepnes' bare leg in the foreground, and the tape's audio is permeated by the sound
of Stepnes' heavy breathing.  The Court was unable to turn off the audio because the purpose of

response, Stepnes called the police.  Officers Illetschko and Chard responded to Stepnes' call.

When they arrived, Christine was on her front steps, and the officers elected to interview

Christine and Robert first.   After speaking with Christine and Robert, the officers went to

Stepnes' home and demanded to see the videotape.  Stepnes complied, and the officers watched a

portion of the tape.[7]  Based on what they saw, they escorted Stepnes to the squad car and put him

in the back seat.   At that point, one of the officers allegedly informed Stepnes that they were

teaching him a lesson.  The officers then left Stepnes and returned to the Tennessens' home.

When they returned to the squad car after speaking with the Tennessens, they put Stepnes in

handcuffs and took him to the jail.  He was booked and given a court date.

On September 17, 2001, Stepnes made a first appearance in Hennepin County District

Court before Judge John L. Holahan on the charges for which he was arrested on September 13,

2001.   At that hearing, Assistant City Attorney Timothy Richards appeared for the charging

party, the City of Minneapolis; Stepnes appeared without a lawyer; and Kurzman appeared for

the Tennessens.  Stepnes alleges that he witnessed Kurzman speaking with the judge ex parte

before the hearing.[8]  During the hearing, Stepnes requested a new hearing date so that his lawyer

---

the exercise was to listen for alleged comments by Christine.  Cueing the tape to a relevant
portion, or supplying a relevant segment, or even indicating the length of the tape, would have
spared the Court's time and patience.

[7]     In Stepnes' memorandum, he argues without citation to the record that the officers did
not view the portion of the tape where Christine Tennessen entered the scene and allegedly made
a comment to Stepnes.  In fact, however, Officer Illetschko's report, which Stepnes has offered
as evidence on this point, reveals that the officers viewed the tape from before Robert
Tennessen's appearance in the picture until the end of the tape.   The evidence therefore
establishes that the officers watched all relevant sections of the videotape.

[8]     Stepnes has offered no evidence of the content of this conversation.  Instead, he asks the
Court to draw an inference that Kurzman was conspiring with Judge Holahan to deprive Stepnes
of his constitutional rights simply because they were seen having a conversation.  Such an
inference would be supported solely by rank speculation.

could be present.  In addition, Kurzman asked that the court impose additional conditions of release, including a Minnesota Rule 20.01 competency evaluation.  In support of his request, Kurzman recounted the history between the Tennessens and Stepnes since April 27.  The record does not reveal the disposition of Stepnes' and Kurzman's respective requests.

On September 27, 2001, the harassment proceedings commenced as scheduled, with Hennepin County Judge Bruce Peterson presiding.  Christine, Robert, Michael, Kurzman, and Stepnes' criminal attorney, Charles Hawkins, were present during the proceedings, as was Stepnes for part of the proceedings.[9]  After the close of evidence, Judge Peterson found that there were "reasonable grounds to believe that Paul C. Stepnes ha[d] engaged in harassment against Robert Tennessen, Chris Tennessen, and Mike Tennessen" and entered a restraining order against Stepnes.  Sometime thereafter, Stepnes understood after a telephone conference in which all parties to the harassment proceedings were represented that the court would also enter restraining orders against the Tennessens.  By agreement and with court approval, all harassment orders were voided on May 30, 2002.

In January 2002, Stepnes was brought to trial in connection with the September 8, 2001, incident.  Judge John McShane presided over the trial, where Stepnes was tried for violation of a protective order and fifth degree assault.  The jury returned a verdict of not guilty on both counts.  Approximately three months later, the City dropped the charges pending against Stepnes in connection with the September 13, 2001, incident.

---

[9]     The day before the hearing was scheduled to commence, a family issue arose for Stepnes. Stepnes therefore requested a continuance of the harassment proceedings.  That request was denied.

Stepnes then brought this action.  He asserts that Defendants conspired to violate his constitutional rights, that Defendants maliciously prosecuted him,[10] and that Christine defamed him when she accused him of assaulting her on September 8.  Defendants now move for summary judgment.

## II.      DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[10]      Stepnes' malicious prosecution claims are less than clear.  In his Complaint, he alleged malicious prosecution claims against all Defendants.  In a chart accompanying Stepnes' opposition to Defendants' motions for summary judgment, however, Stepnes represented that he is pursuing malicious prosecution claims only against the Tennessens.  Nevertheless, Stepnes' arguments in opposition to Defendants' motions for summary judgment strongly suggest that Stepnes is, in fact, pursuing such claims against all Defendants.  Out of an abundance of caution, the Court has assumed that Stepnes intends to pursue malicious prosecution claims against all Defendants.  Litigants, particularly those represented by counsel, have a duty to clearly inform the court of the bases for their requested relief.

**A.     City Defendants' Motion for Summary Judgment**

*1.     Officer Defendants*

a.     Section 1983 claims

Stepnes alleges multiple section 1983 claims against the Officer Defendants. Specifically, he asserts that the Officer Defendants failed to conduct neutral investigations, engaged in bad faith or baseless prosecution, denied him equal protection, selectively enforced the law, compromised his access to the courts, and failed to protect him.  The Officer Defendants argue that they are entitled to qualified immunity for the conduct forming the basis of Stepnes' section 1983 claims against them.

The doctrine of qualified immunity protects state actors performing discretionary functions from civil liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When faced with an assertion of qualified immunity in a suit against an officer for an alleged constitutional violation, the court must first consider whether the facts alleged, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If a constitutional violation could be established, the court then considers whether the right was clearly established.  *Id.*  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 202.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The Court conducts this analysis for each section 1983 claim Stepnes asserts.

i.      Neutral investigation claim

Stepnes first alleges that the officers responding to the September 8 and 13, 2001, calls did not have probable cause to arrest him because they did not conduct a sufficiently thorough or neutral investigation.    Specifically, Stepnes alleges that on both dates, the officers who responded to the Tennessens' and Stepnes' calls went first to the Tennessens' home, met with the Tennessens, made up their minds to arrest Stepnes, and only then went to Stepnes' home to talk to him.

"The Fourth Amendment right of citizens not to be arrested without probable cause is . . . clearly established."[11] *Kuehl v. Burtis*, 173 F.3d 646, 649 (8th Cir. 1999).   "[L]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest."  *Id.* at 650 (quotations omitted).   An arrest is not supported by probable cause when a "minimal further investigation" would have exonerated the suspect.  *Id.*   However, law enforcement officers are not required to conduct "mini-trials" before making an arrest.  *Id.*   "Probable cause exists if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed an offense."  *Flynn v. Brown*, 395 F.3d 842, 844 (8th Cir. 2005) (quotations omitted).   When determining whether an arrest was supported by probable cause, a court must assess the facts as a whole at the time of the arrest and keep in mind that the determination of whether probable cause exists is not an exact science.  *See id.*  The

---

[11]      Stepnes argues that this claim is properly analyzed as a due process claim.  The Court disagrees.   Because Stepnes' complaint is that his arrest was unreasonable, the Fourth Amendment governs his claim.  *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 395 (1989).   To the extent his claim is properly analyzed as a due process claim, however, that claim would also fail. The officers' conduct was not conscience-shocking for the same reasons their decision to arrest Stepnes was reasonable.

court must consider the weight of all the evidence—not merely the sufficiency of the incriminating evidence. *Kuehl*, 173 F.3d at 650.

Turning first to the September 8, 2001, arrest, after being called to the scene, Officers Wisocki and Hatle conducted an investigation. They began their investigation by talking with Christine Tennessen. She informed the officers that Stepnes had been on her property and that he had pushed her down. The officers, noting that her statements were consistent with her distressed state and the dirt and grass stains on the back of her shirt, then went to Stepnes' home. Stepnes did not offer any exculpatory evidence. In fact, the record reveals that Stepnes said nothing to put the officers on notice that Christine's allegation that he had made physical contact with her may have been false. Therefore, viewing the record in the light most favorable to Stepnes, the officers conducted a sufficiently thorough, neutral investigation of the incident before arresting Stepnes. Based on the information obtained during the investigation, the officers had probable cause to arrest Stepnes. Accordingly, Stepnes' Fourth Amendment rights were not violated.

With respect to the September 13, 2001, encounter, Officers Illetschko and Chard—the responding officers on that date—also conducted a investigation in response to the Tennessens' and Stepnes' allegations. Upon being called to the scene by Stepnes after Christine allegedly confronted him, the officers went to the Tennessens' home. The Tennessens informed the officers that Stepnes was violating an outstanding restraining order by standing at their property line and videotaping their family as they entered and exited their home. They alleged this conduct was intended to harass them. Before arresting Stepnes for this conduct, the officers spoke with Stepnes and viewed a videotape Stepnes made of the incident. The videotape corroborated the Tennessens' account and discredited Stepnes' complaint that Christine had

confronted him.   In light of this evidence, viewing the record in the light most favorable to Stepnes, the officers responding to the September 13, 2001, incident conducted a sufficiently thorough, neutral investigation.   Based on the information obtained during that investigation, the officers had probable cause to arrest Stepnes.   Thus, Stepnes' Fourth Amendment rights were not violated.

In sum, the officers' September 8 and 13 investigations and subsequent arrests did not violate Stepnes' Fourth Amendment rights.   Accordingly, the Court dismisses his section 1983 claim insofar as he alleges that the officers' arrests of him were not supported by probable cause because the officers failed to conduct proper investigations.

ii.        Bad faith or baseless prosecution claim

Second, Stepnes argues that the Officer Defendants are liable under section 1983 because they arrested and commenced charges against him for the September 8 and 13 events in bad faith and without basis.   "An action for malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury . . . . [M]alicious prosecution can form the basis of a § 1983 suit only if defendant's conduct also infringes some provision of the Constitution or federal law."   *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 977 (8th Cir. 1993).   Stepnes has not specifically identified any such provision of the Constitution or any federal law as to this claim.   To the extent Stepnes intends to allege that his arrests were made without probable cause in violation of the Fourth Amendment, his claim has no merit for the reasons discussed above. Accordingly, the Court dismisses Stepnes' section 1983 claim insofar as he alleges that he was the victim of bad faith and baseless prosecution by the officers.

iii.     "Class of one" equal protection claim

Third, Stepnes asserts that the Officer Defendants are liable under section 1983 because he is a "class of one" as defined in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam).  He maintains that the officers responding to the September 8 and 13 calls violated his right to equal protection by obtaining the Tennessens' side of the story first on both occasions.  In addition, he claims that the officers violated his rights by arresting him for violation of the restraining order, but not arresting the Tennessens, even though they were also technically in violation of an outstanding restraining order.  Finally, Stepnes argues that the officers treated Michael differently than they treated him upon arrest.  According to Stepnes, Michael was arrested on August 9, 2001, when Stepnes called 911 to report that Michael had violated a restraining order prohibiting Michael from harassing Stepnes.  Shortly after Michael's arrest, Michael's attorney called Judge Franklin Knoll, who ordered the police to release Michael before the booking process was completed.  On the other hand, on each occasion Stepnes was arrested, he was required to go through the entire booking process and was charged.  Stepnes alleges that the Tennessens' political connections enabled them to obtain favorable treatment for their son that Stepnes could not get as an average citizen.

Stepnes' claim that the officers denied him his equal protection rights by obtaining the Tennessens' side of the story first on two occasions is without merit.  He has not identified any authority supporting his claim that he had a constitutional right to be interviewed first.  The police are not so constrained in how they respond to complaints.  Thus, the Court dismisses Stepnes' section 1983 claim insofar as it depends on this allegation.

Stepnes' assertion that the Officer Defendants denied him equal protection by arresting him but not the Tennessens on September 8 and 13 also lacks merit.  To prevail on his "class of

one" equal protection claim, Stepnes must demonstrate that he was intentionally treated differently than the Tennessens, that they were similarly situated, and that there was no rational basis for the difference in treatment.  *See Village of Willowbrook*, 528 U.S. at 564.   No reasonable factfinder could conclude that Stepnes and Christine Tennessen were similarly situated on September 8.  Although the Court must assume at this stage that Christine violated the restraining order by ordering Stepnes to get his dog off her property and by kicking at the dog while it was on her property, the record is undisputed that she did not make physical contact with Stepnes.  Stepnes, on the other hand, did make physical contact with Christine.[12]  Because

---

[12]    At his March 7, 2005, deposition in this action, Stepnes testified as follows:

Q:    You were arrested for the incident with Chris Tennessen where she had some grass stains on the back of her shirt, correct?

A:    I was arrested for that.

Q:    Do you claim that that, that that never happened?

A:    Correct.

Q:    Do you claim that you never made any contact with Ms. Tennessen?

A:    I did not belly-butt Chris Tennessen.

Q:    That's not my question.  My question is did you make contact, physical contact with Chris Tennessen?

A:    Not a forceful, physical contact.

Q:    So you did make physical contact with Chris Tennessen?

A:    In my struggle to get my dog I may have brushed against her, but it was not an intentional assault.

Q:    And when she, when you brushed against her, did you she fall to the ground?

A:    I believe she tripped over her dog and fell to the ground.

Stepnes and Christine were not similarly situated and Stepnes' conduct was more egregious, the officers had a rational basis to treat Stepnes and Christine differently.

On September 13, 2001, the officers had reason to believe that Stepnes was violating the restraining order by standing at the property line and videotaping the Tennessens, not only as they passed, but also as they unlocked their door and entered their house. Although Stepnes asserts that Christine verbally confronted him on the same day in violation of the restraining order—an assertion not supported by the evidence—this conduct would not rise to the same level as Stepnes' conduct. Christine's alleged confrontation was a verbal confrontation that was in no way physical. The officers, however, had reason to believe that Stepnes was attempting to physically intimidate the Tennessens by standing at the property line. This is particularly true in light of the fact that Stepnes had just been arrested a few days prior to this incident for an alleged assault on Christine. Stepnes and the Tennessens were not similarly situated; the officers had a rational basis to treat the two differently. Thus, the Court dismisses Stepnes' section 1983 claim insofar as he alleges that he was denied equal protection when the officers arrested him but not the Tennessens on September 8 and 13. *See Anderson v. Cass County, Mo.*, 367 F.3d 741, 747-48 (8th Cir. 2004) ("[D]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause.").

Finally, the Court turns to Stepnes' contention that the officers violated his equal protection rights by releasing Michael prior to completion of the booking process, but did not do

---

Q:     And that occurred on the Tennessens' property, correct?

A:     That's correct.

Q:     And it occurred after your dog had run over to the Tennessens' property, correct?

A:     Correct.

the same for him.  The undisputed evidence in the record reveals that Stepnes could have had his attorney call the judge on duty to attempt to obtain early release, just as Michael did.  The officers are not to blame for his failure to do so.  Thus, Stepnes' constitutional rights were not violated.  Further, it would not have been clear to reasonable officers that either releasing Michael or booking Stepnes was unlawful in the situation they confronted.  *Saucier*, 533 U.S. at 202.  Accordingly, the officers are entitled to summary judgment on Stepnes' "class of one" claim.

> iv.    Selective enforcement claim

Fourth, Stepnes asserts that the officers are liable under section 1983 because they selectively enforced the law in violation of the Equal Protection Clause.  Although Stepnes' allegations are less than clear and he appears to conflate his selective enforcement, "class of one," and failure to conduct neutral investigation claims, he implies that the officers' decisions to arrest him and not the Tennessens upon receiving the 911 calls on September 8 and 13 were the result of improper motivation.  In particular, Stepnes suggests that his "being the adversary of the Tennessens" motivated the officers to arrest him.[13]

The Equal Protection Clause prohibits selective enforcement of the law based on "unjustifiable" factors.  *See United States v. Deering*, 179 F.3d 592, 594 (8th Cir. 1999).  "An equal protection analysis begins by identifying a fundamental right or a suspect classification to determine the level of scrutiny a court must give to government action."  *Klingner v. City of Braham*, 130 F. Supp. 2d 1068, 1073 (D. Minn. 2001).  Here, Stepnes alleges that his equal protection rights were violated as a result of the officers' classification of him as an adversary of

---

[13]    In his "factual statement," Stepnes repeatedly represents that he is an openly-gay man.  In his argument, however, he does not point to any evidence from which a reasonable factfinder could conclude that Defendants' conduct was motivated by discriminatory animus on account of his sexual orientation.

the Tennessens.  This is not a suspect class.  Therefore, his claim is analyzed under the rational

basis test.  *See More v. Farrier*, 984 F.2d 269, 271 (8th Cir. 1993).  To prevail under the rational

basis test, he must show that he is similarly situated to persons who were treated differently by

the officers and that the officers had no rational basis for the dissimilar treatment.  *Id.*  "Under

the rational basis analysis, even when similarly situated persons are treated differently, state

action is presumed constitutional and will not be set aside if any state of facts reasonably may be

conceived to justify it."  *Klingner*, 130 F. Supp. 2d at 1073-74 (quotations omitted); *see also*

*Deering*, 179 F.3d at 595 ("Absent a substantial showing to the contrary, governmental actions

such as the decision to prosecute are presumed to be motivated solely by proper

considerations.").

    For the reasons set forth above, Stepnes cannot demonstrate that he and the Tennessens

were similarly situated or that there was no rational basis for the officers' different treatment of

them.  Moreover, there is no evidence in the record supporting a reasonable inference that

Stepnes' arrests were motivated by a discriminatory purpose.  *See United States v. Bell*, 86 F.3d

820, 823 (8th Cir. 1996) ("A person claiming unequal enforcement of a facially neutral statute

must show both that the enforcement had a discriminatory effect, and that the enforcement was

motivated by a discriminatory purpose.").[14]  In sum, Stepnes has failed to come forward with any

evidence supporting his claim that his equal protection rights were violated as a result of

selective enforcement.  Accordingly, the officers are entitled to summary judgment on Stepnes'

---

[14]    Stepnes argues that his arrests were motivated by political pressure to appease Robert.  In
support of his position, Stepnes relies on the fact that during the course of his dispute with the
Tennessens, Robert visited the Fifth Precinct of the Minneapolis Police Department.  That fact,
standing alone, is insufficient to establish that the officers responding to the 911 calls faced
untoward pressure to appease Robert.

section 1983 claim insofar as he alleges his arrest was the result of selective enforcement of the law.

v.       Access to courts/retaliation claim

Fifth, Stepnes asserts that the officers are liable under section 1983 because they, in concert with the Tennessens, retaliated against him for seeking a restraining order against the Tennessens. Stepnes asserts that this retaliation was intended to impede his access to the courts.

The Petition Clause of the First Amendment ensures that an individual's constitutional right to access to the courts is not impaired in retaliation for filing a lawsuit. *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1427-28 (8th Cir. 1986). To prevail on a retaliation claim, the plaintiff must demonstrate that (1) he engaged in a protected activity; (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). The plaintiff must demonstrate that the defendant acted with some intentional motivation to restrict the plaintiff's access to the courts. *Scheeler v. City of St. Cloud*, 402 F.3d 826, 830 (8th Cir. 2005); *Nei v. Dooley*, 372 F.3d 1003, 1007 (8th Cir. 2004).

In this case, Stepnes' access-to-courts claim fails because he has not identified any adverse actions by the officers that would chill a person of ordinary firmness from continuing to pursue restraining orders against any of the Tennessens. In fact, Stepnes' summary judgment submissions do not contain any argument as to this claim. Nevertheless, to the extent Stepnes' submissions are properly read to suggest that the September 8 and 13 arrests were made in an attempt to prevent Stepnes from pursuing the restraining orders, whatever the Tennessens' motivations in complaining about Stepnes to law enforcement, Stepnes has not offered any

evidence that any City official had any retaliatory motive.  The record establishes that the officers promptly responded to each of his 911 calls and on two occasions arrested the Tennessens' son in response to his calls.  Although Stepnes was also arrested on two occasions, drawing all reasonable inferences in favor of Stepnes, no reasonable factfinder could conclude from the evidence in the record that he was arrested in an effort to impede or limit his access to the courts or in retaliation for appealing to the courts.  In sum, Stepnes has failed to come forward with any evidence that his constitutional right to unimpeded access to the courts was violated.  Accordingly, the Court dismisses his section 1983 claims insofar as they depend upon this allegation.

> vi.     Failure to protect claim

Finally, Stepnes argues that the officers are liable under section 1983 because they violated his constitutional right to police protection.  Stepnes implies that when Stepnes called the police on September 8 and 13, the police specifically refused to take action on his behalf and instead arrested him.  Stepnes does not, however, have a constitutional right to police protection from other private citizens.  *See DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 (1989) ("[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."); *Johnson v. City of Evanston*, 250 F.3d 560, 563 (7th Cir. 2001).[15]  The Court therefore dismisses Stepnes'

---

[15]     Moreover, for the reasons stated above, Stepnes has failed to demonstrate that he was, in fact, deprived of police protection.  The undisputed evidence reveals that the officers responded to his 911 calls, took reports, and made arrests when appropriate.  On September 8, Stepnes entered the Tennessens' property while he was subject to a restraining order and "brushed up against" Christine.  Immediately thereafter, Christine fell over backwards.  On September 13, the evidence demonstrates that the Tennessens did nothing illegal.  Even if Christine said something to Stepnes that cannot be perceived from the videotape, it is beyond question that Stepnes himself stood near the parties' property line and videotaped the Tennessens' movements into

section 1983 claim insofar he alleges that the officers' failure to protect him violated his constitutional rights.

        b.        Malicious prosecution claims

In addition to alleging section 1983 claims, Stepnes alleges that the Officer Defendants instituted criminal actions against him without probable cause and with no reasonable ground on which to base a belief that they would prevail on the merits of the claims.[16]  Stepnes further alleges that the Officer Defendants acted with malicious intent.   To prevail on his claim of malicious prosecution, Stepnes must demonstrate that:  (1) the September 8 and 13 actions were brought without probable cause or a reasonable belief that Stepnes would be convicted for his conduct; (2) the actions were instituted and prosecuted with malicious intent; and (3) the actions terminated in favor of Stepnes.  *See Kellar v. VonHoltum*, 568 N.W.2d 186, 192 (Minn. Ct. App. 1997).  There is no dispute that the September 8 and 13 actions terminated in favor of Stepnes. However, for the reasons set forth above, the officers had probable cause on both occasions to arrest Stepnes.  Accordingly, the Court dismisses Stepnes' malicious prosecution claims against the Officer Defendants.

## 2.    *City of Minneapolis*

In addition to alleging claims against the Officer Defendants, Stepnes alleges claims against the City.  Specifically, Stepnes asserts that the City should be held liable under section 1983 for violation of his constitutional rights.  He further alleges that the City is liable for

---

their home.  Those movements had no relevance to any property dispute, the purpose for which he was allegedly using the video camera.

[16]    The Court assumes without deciding that the officers instituted criminal actions against Stepnes by arresting him per the tab charge system used by the City.  Under that system, charges are initiated during the booking process.

malicious prosecution as a result of the City Attorney's failure to immediately dismiss the September 8 and 13, 2001, charges.  The Court addresses each allegation in turn.

       a.      Section 1983 claims

The Court turns to Stepnes' section 1983 claims against the City.  Municipalities may not be held vicariously liable under section 1983 for the torts of their employees.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  Rather, the party asserting a claim against a municipality must demonstrate that (a) his or her constitutional rights were violated, and (b) a municipal policy or custom motivated the violation.  *Id.*  In this case, Stepnes argues that the City should be held liable under section 1983 for the conduct of the Officer Defendants, the conduct of the City attorney responsible for the September 8 and 13 charges, and for the City's tab charge system.

       i.      City liability for officers' conduct

Stepnes argues that the City should be held liable for the Officer Defendants' alleged violation of his constitutional rights identified above.  He claims that the violations were caused by the City's failure to train the officers to perform neutral and unbiased investigations.  He further claims that the failure amounted to "deliberate indifference to the rights of persons with whom the police come into contact."  Stepnes has not, however, offered any evidence supporting his bald allegation that the City failed to adequately train its officers to perform neutral and unbiased investigations or that the alleged failure amounted to deliberate indifference.  A plaintiff asserting municipal liability on a failure to adequately train theory is required to demonstrate both.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-90 (1989) (holding that plaintiff must show that the City had notice that the City's procedures were inadequate and likely to result in a violation of the plaintiff's constitutional rights).  Even if he had made this required

showing, for the reasons set forth above, Stepnes cannot establish that the officers' conduct violated his constitutional rights. Thus, even if the officers' conduct had been motivated by a municipal policy or custom or was caused by the City's inadequate training, Stepnes' claims against the City on this ground must be dismissed. *See Kiser v. City of Huron*, 219 F.3d 814, 816 (8th Cir. 2000) (holding that city was entitled to summary judgment because officers did not violate plaintiff's clearly established federal or constitutional rights).

ii.    City liability for City attorney's prosecutorial decisions

Stepnes next argues that the City should be held liable for the City attorney's decision to prosecute him for the September 8 and 13, 2001, encounters.[17] The gravamen of Stepnes' allegations appears to be that the City Attorney's Office treated him less favorably than it treated Michael, and Stepnes was thereby denied his right to equal protection. Stepnes argues that Michael was actually more "dangerous" than him, yet the City Attorney declined to prosecute Michael and prosecuted him.

Stepnes' protestations to the contrary, there was a rational basis for the City's decision to prosecute Stepnes but not Michael. On September 8, Stepnes was arrested after he made physical contact with Christine while on her property and while he was subject to a restraining order. Similarly, on September 13, Stepnes was arrested for attempting to physically intimidate the Tennessens by standing at the property line and videotaping them while he was subject to a restraining order. On the other hand, Michael did not make physical contact with Stepnes on

---

[17]    The Court declines to reach the issue of whether, under *Monell*, the City can be charged with the conduct of the attorney responsible for pursuing charges against Stepnes. The Court notes, however, that Stepnes' argument appears to depend upon the assumption that Heffern, the City Attorney, made the decision to prosecute Stepnes. The undisputed facts reveal that it was not Heffern who made the prosecutorial decisions as to Stepnes. Rather, the decisions were made by a different attorney for the City. Stepnes has offered no evidence whatsoever that this attorney had policymaking authority.

either occasion of which Stepnes complains.  On April 27, when Michael showed his knife, Michael and Stepnes were separated by a fence.  On August 9, Michael did not engage in any physically threatening conduct.  Although Michael allegedly engaged in physically threatening behavior on April 27, he was not then subject to a restraining order.  On the other hand, on both occasions on which Stepnes was arrested, he was subject to a restraining order.  Because Michael and Stepnes were not similarly situated, Stepnes cannot establish that his right to equal protection was violated.  *See Anderson*, 367 F.3d at 747-48.  The Court therefore dismisses Stepnes' section 1983 claim against the City insofar as he alleges that the City prosecutor denied Stepnes his constitutional right to equal protection.

Alternatively, Stepnes argues that the September 8 and September 13 charges were not supported by probable cause.  Stepnes implies that, as a result, the City prosecutor's decision not to immediately dismiss the charges violated his constitutional rights and the City should be held liable for the decisions under section 1983.  Stepnes does not identify specifically which of his federal rights he believes were violated by the prosecutor's decision.  Whatever the basis, however, for the reasons set forth above, the charges were supported by probable cause. Therefore, the Court dismisses Stepnes' section 1983 claim against the City insofar as he maintains that the City prosecutor violated his constitutional rights by failing to immediately dismiss the September 8 and 13 charges.

iii.    City liability for tab charge system

Finally, Stepnes implies that the City's tab charge system caused the deprivation of his rights and that the City should therefore be held liable for those deprivations under section 1983. Stepnes does not, however, identify specifically the federal rights of which he believes he was deprived as a result of the tab charge system.  This failure is grounds for dismissal.  *See DuBose*

*v. Kelly*, 187 F.3d 999, 1004 (8th Cir. 1999) (holding that the second element of a claim under Section 1983 requires the plaintiff to identify the particular right that has been violated); *see also Isakson v. First Nat'l Bank in Sioux Falls*, 990 F.2d 1098, 1098 (8th Cir. 1993) ("Appellants have failed to state a claim under section 1983 because they failed to allege the violation of a right secured by the Constitution and laws of the United States." (quotations omitted)). Nevertheless, construing Stepnes' submissions broadly, the submissions could be interpreted to assert that the tab charge system was the cause of the alleged violation of his right to equal protection. For the reasons set forth above, Stepnes was not deprived of his right to equal protection. Alternatively, Stepnes' submissions could be interpreted to allege that the tab charge system violated his procedural due process rights. Stepnes does not, however, offer any facts or authority suggesting he was deprived of constitutionally required procedural safeguards. Finally, Stepnes' submissions could be read to allege that his substantive due process rights were violated because he was required to stand trial for the September 8, 2001, incident, notwithstanding the fact that the charge was not supported by probable cause. For the reasons set forth above, probable cause supported the decision to require Stepnes to stand trial. Moreover, the prosecutor—not the tab charge system—made the decision to bring Stepnes to trial for the September 8 incident. Thus, insofar as Stepnes intended to allege a section 1983 claim based on the tab charge system, the Court dismisses this claim.

       b.    Malicious prosecution

Although Stepnes' claims are murky, he implies at times that the City should be held liable for malicious prosecution as a result of the City prosecutor's decision not to immediately dismiss the charges arising from the September 8 and 13, 2001, incidents. Preliminarily, the Court notes that Stepnes' malicious prosecution claims are not actionable under section 1983.

*See Sanders*, 984 F.2d at 977.  Assuming that Stepnes intended to assert malicious prosecution as an independent state common law claim, the Court dismisses the claim for the reasons set forth in the analysis of this claim as to the other defendants.

3.      *Minneapolis Police Department*

Stepnes alleges claims against the Minneapolis Police Department.  The Police Department is not, however, a legal entity subject to suit.  *See Hyatt v. Anoka Police Dep't*, 700 N.W.2d 502, 505-06 (Minn. Ct. App. 2005).  Accordingly, the Court dismisses Stepnes' claims against the Police Department.

**B.      The Tennessens' Motion for Summary Judgment**

Stepnes asserts that the Tennessens are liable under section 1983 on the same six theories under which he asserted section 1983 claims against the Officer Defendants.  In addition, he alleges claims for malicious prosecution and defamation against the Tennessens.  The Tennessens move for summary judgment on each claim.

1.      *Section 1983 claims*

The Court turns to Stepnes' section 1983 claims against the Tennessens.  "In any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present:  (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."  *DuBose*, 187 F.3d at 1002.

"As a result of [the] 'under color of state law' requirement, § 1983 rarely provides a cause of action against a private individual, restricting § 1983 to 'state action.'"  *Destek Group, Inc. v. N.H. Pub. Utils. Comm'n*, 318 F.3d 32, 39-40 (1st Cir. 2003).  Section 1983 does, however, provide a cause of action against private citizens who both (1) exercise some right or

privilege created by the state, and (2) act in concert with or obtain significant aid from state officials who are themselves involved in a constitutional violation.  *See Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 739-40 (8th Cir. 2001), *aff'd en banc*, 286 F.3d 498 (8th Cir. 2002); *DuBose*, 187 F.3d at 1003.  With respect to the second element, "[t]he key inquiry is whether the private party was a willful participant in [a] corrupt conspiracy" with a state official. *DuBose*, 187 F.3d at 1003.  Otherwise stated, a plaintiff asserting a section 1983 claim must "offer evidence sufficient to support the conclusion that [private citizens and state officials] directed themselves toward an unconstitutional action by virtue of a mutual understanding and provide facts which would establish a meeting of the minds."  *Id.*  (quotations omitted).  In this case, Stepnes asserts that the Tennessens acted under color of state law by conspiring with various state officials, including the named police officers, various Hennepin County judges, and the City Attorney.

The Court turns first to Stepnes' allegation that the Tennessens conspired with the named police officers to violate his constitutional rights on September 8 and 13.  Stepnes maintains that conspiracy can be inferred from the fact that Robert Tennessen visited the Fifth Precinct of the Minneapolis Police Department and from the fact that, on both occasions on which Stepnes was arrested, the responding officers spoke to the Tennessens before arresting Stepnes.  In support of his claim that this evidence is sufficient to raise a genuine issue of material fact, Stepnes relies heavily on *Bang v. Utopia Restaurant*, 923 F. Supp. 46 (S.D.N.Y. 1996).  In *Bang*, the court concluded that the facts, as alleged, could give rise to a reasonable inference that the police officers accused of conspiring with the private citizen defendants arrested the plaintiff—a restaurant patron—for criminal trespass even though they knew that they did not have probable cause to arrest.  The court held that joint action could be inferred from the fact that the private

defendants conferred with the officer defendants for a significant amount of time before the officers arrested the plaintiff—during which time the plaintiff was peaceably sitting at the restaurant in the defendants' presence—and conducted no inquiry to confirm the accuracy of the private defendants' allegations.

In this case, unlike *Bang*, the undisputed facts demonstrate that on both occasions on which Stepnes was arrested, the officers made a reasonable inquiry prior to making the arrest. With respect to the September 8, 2001, incident, the officers spoke with Christine Tennessen about what happened and concluded that her demeanor and the stains on the back of her shirt corroborated her version of the events. Stepnes does not dispute that he made physical contact with her. Similarly, with respect to the September 13 incident, Stepnes himself acknowledged that the officers spoke with him and, in fact, demanded to see the videotape of the incident prior to arresting him. In light of the timing of the arrests, the officers' reasonable inquiry, and the existence of corroborating evidence, no reasonable factfinder could infer that the officers and the Tennessens conspired to violate Stepnes' constitutional rights. *See Lane v. Johnson*, 385 F. Supp. 2d 1146, 1151 (D. Kan. 2005) ("The mere fact that a private party furnished information, even if false, is not sufficient to constitute joint activity with state officials to state an actionable claim under § 1983."); *Bang*, 923 F. Supp. at 50; *Occhino v. Lannon*, 150 F.R.D. 613, 623 (D. Minn. 1993) ("It is universally recognized . . . that the mere furnishing of information to police officers does not constitute joint action under color of State law which renders a private citizen liable under Section 1983. Without more, the mere elicitation of police assistance is not an exercise of official state authority."). Not only was there no conspiracy, the officers did not violate Stepnes' constitutional rights. Accordingly, even if Stepnes could establish a meeting of

the minds, his section 1983 claims against the Tennessens would fail.  *See Audio Odyssey*, 245 F.3d at 740.

The Court turns next to Stepnes' allegation that the Tennessens are liable under section 1983 because they conspired with various Hennepin County judges and City prosecutors to deprive him of his constitutional rights.  Stepnes asserts that conspiracy can be reasonably inferred from the fact that Robert Tennessen and his agent, Marc Kurzman, had ex parte conversations with a number of the Hennepin County judges with whom Robert was acquainted about the Tennessens' dispute with Stepnes.  In addition, Stepnes argues that Robert put political pressure on the City Attorney's Office to prosecute Stepnes.  In support of his position that this evidence is sufficient to demonstrate a genuine issue of material fact that the Tennessens were acting under color of state law, Stepnes relies on *DuBose*.

In *DuBose*, the plaintiff had brought suit against his former attorney for malpractice, breach of contract, and breach of fiduciary duty for his former attorney's mishandling of an employment lawsuit.  187 F.3d at 1000.  He lost that lawsuit and thereafter brought a section 1983 suit in federal court alleging that his former attorney, his former attorney's attorneys, and the state trial judge conspired to deprive him of his due process rights in connection with his claim against his former attorney.  *Id.*  In the section 1983 case, the defendants moved for summary judgment and the district court granted the motion.  *Id.*  On appeal, the Eighth Circuit Court of Appeals reversed, concluding that the plaintiff had presented sufficient evidence to warrant a reasonable inference that the defendants willfully participated in a conspiracy to deprive DuBose of his due process rights.  *Id.* at 1003.  The court reasoned that the plaintiff offered evidence that the judge assured the plaintiff's former attorney that the attorney would be able to enjoy his retirement.  *Id.*  The defendants were present at the time that pre-trial statement

was made.  *Id.*  Moreover, the plaintiff offered a sworn affidavit that he overheard statements in

an ex parte pre-trial discussion among the defendants about how best to "cover" the plaintiff's

proposed trial exhibits.  *Id.*  The court wrote:

> We emphasize that more is involved here than a simple display of
> cordiality between a judge and the lawyers for one party.  More is involved than
> an ex parte contact between the judge and these lawyers.  Such incidents can
> create an appearance of impropriety, and can, in some circumstances, violate
> ethical norms, but they are not usually serious enough to justify an inference of
> deliberate bias or prejudgment.  For us, the key factor in the case is the Judge's
> assurance, given in private to [the plaintiff's former attorney], that he could
> "enjoy his retirement," and that Mr. DuBose's "trial exhibits [were] . . . covered
> . . . ."  In context, these statements could reasonably be taken by a finder of fact to
> mean that [the defendants] had all agreed, in advance, that [the plaintiff's former
> attorney] would win the case.  The lawyers' continued appearance before the
> judge with the knowledge that such an assurance had been given would justify an
> inference that they had acquiesced in this corrupt agreement.

*Id.*

As has been noted, section 1983 can subject private actors to liability if they act as part of

a corrupt conspiracy with a state actor.  In his submissions, Stepnes emphasizes the conduct and

motivations of the Tennessens but is coy with respect to his allegations of improper state action:

"in order to treat even wrongdoing judges with as much grace as possible, Stepnes has not used a

particular term . . . that begins with 'c'."  He acknowledges that "certain judges may not have

known how Tennessen was using the conversations" he had with them.  The Court is left to sift

through the sweeping yet oblique allegations of misconduct made by Stepnes in an attempt to

identify which judicial actions, if any, evidence the sort of concerted action and meeting of the

minds with the Tennessens that would support private-actor section 1983 liability.

Even if the Court were to assume that Robert Tennessen had ex parte conversations with

certain Hennepin County judges about Stepnes, that fact is insufficient to establish a conspiracy

to violate Stepnes' constitutional rights.  The conclusion Stepnes would have the Court draw

would require undue speculation.  *See id.*  ("Such incidents can create an appearance of impropriety . . . but they are not usually serious enough to justify an inference of deliberate bias or prejudgment.").  Stepnes' repeated reference to Judge Knoll's decision to order Michael released from prison prior to the end of the booking process on August 9 is misplaced.  That the Tennessens obtained the release of their son by having Kurzman call Judge Knoll does not establish a conspiracy to deprive Stepnes of his constitutional rights.  There is no evidence that Stepnes' name was mentioned during this conversation and there is no evidence that, by agreeing to release Michael, the parties jointly intended to deprive Stepnes of his constitutional rights.  Similarly, Stepnes offers no evidence of the content of the alleged conversation between Marc Kurzman and Judge Holahan.  Moreover, he does not point to any federal right that he was deprived of as a result of that conversation.  In fact, Stepnes has failed to demonstrate that any Hennepin County judge was involved in a violation of his constitutional rights.  Accordingly, this evidence is insufficient to hold the Tennessens liable under section 1983.  *See Audio Odyssey*, 245 F.3d at 740 ("[A] plaintiff must show that the private party acted in concert with or obtained significant aid from state officials who were themselves involved in a constitutional violation.").

As to Stepnes' claim that the Tennessens put political pressure on City Attorney Heffern, there is no evidence that the Tennessens or Heffern expressed any desire during their meetings to violate Stepnes' rights or that Heffern acquiesced in any plan to violate Stepnes' rights.  No reasonable factfinder could conclude that the Tennessens and the City Attorney conspired to violate Stepnes' rights merely because they spoke to one another.  *Cf. Lane*, 385 F. Supp. 2d at 1151 (D. Kan. 2005); *Occhino*, 150 F.R.D. at 623.  The Court acknowledges that Stepnes has offered an affidavit of his criminal attorney, who avers that a City prosecutor told him after

Stepnes' criminal trial that the City Attorney's Office faced political pressure to prosecute Stepnes. That a City prosecutor felt political pressure is, however, insufficient to raise a genuine issue of material fact that the Tennessens conspired with the City Attorney's Office to deprive Stepnes of his constitutional rights. Not only does Stepnes' evidence not support an inference of a corrupt conspiracy, for the reasons set forth above, Stepnes' constitutional rights were not violated when he was arrested and prosecuted in connection with the September 8 and 13 incidents.

In sum, Stepnes has not offered any evidence that would permit a reasonable inference that the Tennessens conspired with state or local officials to violate his federal rights. Moreover, he cannot prove that his rights were violated. His section 1983 claims against the Tennessens therefore fail.

2.   *Malicious prosecution*

Stepnes next alleges that the Tennessens are liable for malicious prosecution as a result of his criminal prosecutions for the activities occurring on September 8 and 13, 2001. There is no dispute that the September 8 and 13 actions terminated in favor of Stepnes. The parties do, however, dispute whether the actions were brought with probable cause and whether they were instituted or prosecuted with malicious intent.

a.   September 8, 2001, criminal prosecution

Based on the record before the Court, there is no genuine issue of material fact that the Tennessens had probable cause to believe that Stepnes had violated the restraining order in effect on September 8, 2001. By Stepnes' own admission, he entered the Tennessens' yard, brushed up against Christine, and immediately thereafter she fell down. Coming into physical contact with

Christine violated the restraining order, which prohibited Stepnes from harassing Robert, Christine, or Michael. According to the restraining order,

> Harassment means: a single incident of physical or sexual assault or repeated incidents of intrusive, or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security or privacy of another, regardless of the relationship between the actor and the intended target.

In addition, Stepnes' conduct violated Referee Lawson's June 18, 2001, instruction that the parties not contact each other at all. In sum, whether Stepnes intended to come into physical contact with Christine or not, no reasonable factfinder could conclude that Christine's call to the police to report the incident was baseless or unsupported by probable cause.

    b.    September 13, 2001, criminal prosecution

Stepnes' claim for malicious prosecution with respect to the September 13, 2001, events also fails as a matter of law. The Tennessens had probable cause to believe that Stepnes was harassing them in violation of the restraining order. Not only was Stepnes standing at the property line, but he also continued to videotape them for no apparent reason as they entered their home. Both the Tennessens and the officers had reason to believe that Stepnes was, in violation of the restraining order, engaging in repeated intrusive or unwanted gestures that were intended to have a substantial adverse effect on the Tennessens' safety and privacy.[18]

---

[18]    Because the Tennessens had probable cause to complain about Stepnes' behavior on both September 8 and 13, the Court need not determine whether Stepnes has come forward with evidence sufficient to raise a genuine issue of material fact as to whether the Tennessens acted with the requisite malice. The Court notes, however, that some of Stepnes' purported evidence of malice is bizarre. In his memorandum he argues that the Tennessens' malice is evident from their failure to inform him of Michael's history of violence when they adopted Michael ten years prior to the incidents relevant to this case and from their failure to tell Stepnes of Michael's mental impairments. In addition, Stepnes argues that malice can be inferred from the fact that "[w]hen Stepnes asked [Christine] to get her son out of the neighborhood, she held it against him." The Tennessens had no duty to inform Stepnes of Michael's childhood difficulties or of his mental heath. As a result, no reasonable factfinder could infer malice from this evidence.

3.    *Defamation claim*

Finally, Stepnes alleges a claim for defamation against Christine Tennessen.  For a statement to be considered defamatory, (1) it must be communicated to someone other than the plaintiff; (2) it must be false; and (3) it must tend to harm plaintiff's reputation and to lower him in the estimation of the community.  *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980).  The statute of limitations for defamation is two years.  *See* Minn. Stat. § 541.07 (2004).  It begins to run on the date that the alleged defamatory statement was made, not when it is discovered by the plaintiff.  *See McGovern v. Cargill, Inc.*, 463 N.W.2d 556, 558 (Minn. Ct. App. 1990).

In this case, Stepnes alleges that Christine Tennessen defamed him when she filed a police report on September 8, 2001, claiming that he assaulted her on that date.  Stepnes did not file this action until January 9, 2004—four months after expiration of the statute of limitations.  Thus, to the extent Stepnes relies on Christine's September 8, 2001, complaint to City police officers, his defamation claim is time-barred.

In supplemental briefing authorized by the Court, Stepnes argued for the first time that the complained of defamatory comment occurred during conversations Christine had with the City prosecutor immediately prior to the January 2002 trial.  A defamation claim made based on these statements would not be time-barred.  However, these allegations are not found anywhere

---

Moreover, Stepnes' claim that Christine held against him his demand that the Tennessens remove their adopted son from the neighborhood is unsupported by the record.  In any event, Stepnes has not come forward with any evidence linking the Tennessens' displeasure with Stepnes' demand to their September 8 and 13 reports to the police.

in the Complaint and are therefore not properly before the Court.[19]  Even if the Court were to consider them, Stepnes has not identified with sufficient specificity a defamatory comment Christine made to the prosecutor.  He has merely supplied the Court with notes from the prosecutor's file and implied—without citation to the record—that the notes were taken in January 2002.  There is, however, no clear indication that the notes were, in fact, taken during the course of a conversation with Christine.  In fact, there is no evidence, absent Stepnes' unsupported assumption about when the notes were taken, of what Christine told the prosecutor during their January 2002 meeting.  "Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim."  *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000).  Stepnes' new factual basis is therefore not well-taken.

In the alternative, Stepnes argued for the first time in the supplemental briefing that Robert Tennessen made comments to various judges about the proceedings pending against Stepnes.  For example, Stepnes points to evidence that Robert told Judge Knoll that there were criminal charges pending against Stepnes.  Stepnes also points to evidence that Robert talked regularly with Hennepin County Judge John Sommerville and, during those conversations, updated him on the legal proceedings with Stepnes.  According to Stepnes, as long as one of these statements was made within the statute of limitations, under the continuing violation doctrine, he can recover for any defamatory comment Christine made in September 2001.  Stepnes has not, however, specifically identified any false statements Robert made to any judges or other individuals about the September 8, 2001, incident.  There is therefore no continuing

---

[19]   The Court notes that Stepnes alleged in his Complaint that Christine Tennessen lied when testifying at the criminal trial.  He does not, however, rely on this allegation in opposition to the Tennessens' motion for summary judgment on his defamation claim.

violation. Accordingly, Stepnes' alternative argument is without merit. The Court grants the Tennessens' motion for summary judgment as to Stepnes' defamation claim.

**C.      John Does 1-4**

In the Complaint, Stepnes asserts claims against John Does 1-4, "reserved for those individuals, agencies, or organizations that are later identified as defendants in this action." Rule 4 of the Federal Rules of Civil Procedure provides in part:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). In this case, more than 120 days have passed since the filing of the Complaint and it does not appear from the record that John Does 1-4 have been served. If Stepnes does not establish within ten days of the date of this Order good cause for his failure to serve John Does 1-4, the Court will dismiss the action as to those defendants.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.   The City Defendants' Motion for Summary Judgment [Docket No. 35] is GRANTED.

2.   The Tennessens' Motion for Summary Judgment [Docket No. 42] is GRANTED.

3.   Stepnes' Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE as to Robert and Christine Tennessen and the City Defendants.

4.   Within ten (10) days of the date of this Order, Stepnes shall show good cause for his failure to serve John Does 1-4.

Dated:  August 16, 2006

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge